**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **PENNY BEASLEY, BRITTANY WARD, DEVIN CARRASQUILLO,, REX LAWSON, MICHAEL TUCKER, HUNTER CARTER, TYRONE KENNETH JOHNSON, HERMAN ISLAND, DENNIS WHITING, MADELINE WHELAN, STACEY NOLLEY, DANNY NGUYEN, ALICIA BRAVO** and **ZACH PETTIS**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC, LOCKTON COMPANIES, LLC, HOUSE OF RAEFORD FARMS, INC.**, and **DOLLAR TREE, INC.**,<br><br>Defendants. | Case No. 25-00222-CV-W-BP<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Penny Beasley, Brittany Ward, Devin Carrasquillo, , Rex Lawson, Michael Tucker, Hunter Carter, Tyrone Kenneth Johnson, Herman Island, Dennis Whiting, Madeline Whelan, Stacey Nolley, Danny Nguyen, Alicia Bravo and Zach Pettis (collectively "Plaintiffs") bring this Consolidated Class Action Complaint ("Complaint") against Defendants Southeast Series of Lockton Companies, LLC ("SSLC"), Lockton Companies, LLC ("LC"), House of Raeford Farms ("Raeford"), and Dollar Tree, Inc. ("Dollar Tree") (collectively, "Defendants") as individuals and on behalf of all others

similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This class action arises out of the recent data breach ("Data Breach") involving Defendants.

2. Defendant Lockton Companies, LLC is a company that provides insurance, risk management, and employee benefits.

3. Defendant Southeast Series of Lockton Companies, LLC is a series LLC of Lockton Companies, LLC.

4. Plaintiffs bring this Consolidated Class Action Complaint against Defendants for their failure to properly secure and safeguard the personally identifiable information that they collected and maintained as part of their regular business practices, including Plaintiffs' and Class Members' names, dates of birth and Social Security numbers (collectively defined herein as "PII") and health insurance information and medical information, which is protected health information ("PHI", and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

5. According to Defendants' breach report to the HHS' Office for Civil Rights, the Data Breach impacted approximately 1,025,956 individuals.[1]

6. Upon information and belief, Plaintiffs and Class Members are current and

---

[1] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited May 21, 2025).

former employees or beneficiaries of SSLC's clients who were required to entrust Defendants with sensitive, non-public Private Information, without which Defendants could not perform their regular business activities, in order to obtain employment or certain employment benefits at SSLC's clients. Defendants retain this information for many years, even after the employment and customer relationships have ended.

7. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

8. Defendants failed to adequately protect Plaintiffs' and Class Members Private Information—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and their utter failure to protect Plaintiffs' and Class Members' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk of identity theft and fraud to victims of the Data Breach will remain for their respective lifetimes.

9. In breaching their duties to properly safeguard clients', employees', and beneficiaries' Private Information, and to give timely, adequate notice of the Data Breach's occurrence, Defendants' conduct amounts to negligence and/or recklessness and violates federal and state statutes.

10. Plaintiffs bring this action on behalf of all persons whose Private Information

was compromised as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts to negligence and intentional misconduct and violates federal and state statutes.

11. Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

12. Plaintiffs and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an

increase in spam calls, texts, and/or emails; (viii) attempted and actual fraud; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

13. Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## PARTIES

14. Plaintiff **Penny Beasley** is a natural resident and citizen of Grayson, Georgia.

15. Plaintiff **Brittany Ward** is a natural resident and citizen of West Monroe, Louisiana.

16. Plaintiff **Devin Carrasquillo** is a natural resident and citizen of Paterson, New Jersey.

17. Plaintiff **Rex Lawson** is a natural resident and citizen of Battle Creek, Michigan.

18. Plaintiff **Michael Tucker** is a natural resident and citizen of Jefferson, Ohio.

19. Plaintiff **Hunter Carter** is a natural resident and citizen of Branchville, South Carolina.

20. Plaintiff **Tyrone Kenneth Johnson** is a natural resident and citizen of

Mansfield, Ohio.

21. Plaintiff **Herman Island** is a natural resident and citizen of Chicago, Illinois.

22. Plaintiff **Dennis Whiting** is a natural resident and citizen of Ormond Beach, Florida.

23. Plaintiff **Madeline Whelan** is a natural resident and citizen of Seekonk, Massachusetts.

24. Plaintiff **Stacey Nolley** is a natural resident and citizen of Jacksonville, Texas.

25. Plaintiff **Danny Nguyen** is a natural resident and citizen of Jacksonville, Texas.

26. Plaintiff **Alicia Bravo** is a natural resident and citizen of Beaumont, California.

27. Plaintiff **Zach Pettis** is a natural resident and citizen of Sierra Vista, Arizona.

28. Defendant **Southeast Series of Lockton Companies, LLC** is a series limited liability company with its principal place of business located in Kansas City, Missouri.

29. Defendant **Lockton Companies, LLC** is a limited liability company with its principal place of business located in Kansas City, Missouri.

30. Defendant **House of Raeford Farms, Inc.** is a North Carolina company with its principal place of business located in Rose Hill, North Carolina.

31. Defendant **Dollar Tree, Inc.** is a Virginia Corporation with its principal place of business located in Chesapeake, Virginia.

## JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from any Defendant.

33. This Court has personal jurisdiction over Defendants Southeast Series of Lockton Companies, LLC and Lockton Companies, LLC because their principal place of business is in this District, they regularly conduct business in this District, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

34. This Court has personal jurisdiction over Defendants House of Raeford Farms, Inc., and Dollar Tree, Inc. because they regularly conduct business in this District, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

35. Venue is proper under 18 U.S.C § 1391(b)(1) because two of the Defendants' principal place of business are in this District.

## FACTUAL ALLEGATIONS

***Background of Defendants.***

36. Defendant Lockton Companies, LLC is a company that provides insurance, risk management, and employee benefits.

37. Defendant Southeast Series of Lockton Companies, LLC, is a series LLC of Lockton Companies, LLC.

38. Defendants House of Raeford Farms, and Dollar Tree, Inc. are clients of

Defendants Southeast Series of Lockton Companies, LLC and Lockton Companies, LLC.

39. Plaintiffs and Class Members are current and former employees or beneficiaries of Defendant SSLC's clients.

40. In order to apply to be an employee or obtain certain employment-related benefits with Defendant SSLC's clients, Plaintiffs and Class Members were required to provide sensitive and confidential Private Information, including their names, dates of birth, health insurance information, medical information, and Social Security numbers.

41. The information held by Defendants in their computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

42. Upon information and belief, Defendants made promises and representations to SSLC's clients' employees and beneficiaries, including Plaintiffs and Class Members, that the Private Information collected from them as a condition of their employment and/or receiving benefits would be kept safe and confidential, that the privacy of that information would be maintained and that Defendants would delete any sensitive information after they were no longer required to maintain it.

43. Indeed, Defendant SSLC provides on its website that: "Lockton is committed to protecting the privacy of Internet users who visit our websites."[2]

44. Upon information and belief, Defendants Raeford, Dollar Tree and LC maintain materially similar privacy policies.

---

[2] https://global.lockton.com/us/en/privacy-notice.

45. Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

46. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members relied on the sophistication of Defendants to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

47. Defendants Raeford, Dollar Tree, SSLC, and LC represented to Plaintiffs and the proposed Class that they would take adequate measures to safeguard their Private Information, including ensuring that SSLC undertook adequate measures to safeguard that Private Information, and Plaintiffs and members of the proposed Class relied on these representations when they agreed to provide their Private Information to Raeford, Dollar Tree, SSLC, and LC.

48. Defendants each had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendants have a legal duty to keep SSLC's clients', employees', and beneficiaries' Private Information safe and confidential.

49. Defendants had obligations created by the FTC Act, contract, industry

standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

50. Defendants derived a substantial economic benefit from collecting Plaintiffs' and Class Members' Private Information. Without the required receipt of Private Information, Defendants could not perform the services they provide.

51. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

***The Data Breach.***

52. On or about March 20, 2025, Defendant SSLC began sending Plaintiffs and other victims of the Data Breach a Notice of Data Incident letter (the "Notice Letter"), informing them that:

> **What Happened?** On November 20, 2024, Lockton discovered suspicious activity on a single Lockton computer. Lockton immediately began an investigation, engaged third-party cybersecurity experts, and notified law enforcement. The investigation found that an unauthorized party accessed a single individual account and computer within the Lockton environment and obtained certain files on November 20, 2024. Lockton then conducted a robust review of the files to identify individuals whose personal information may have been contained within the files. Upon completion of the review, on February 5, 2025, Lockton began notifying clients of this incident, and Lockton is notifying you on its client's behalf.
>
> **What Information Was Involved?** We completed our review and determined that some of your personal information was contained in the files including your name,

Social Security number, date of birth, health information, and medical insurance information.[34]

53. Omitted from the Notice Letter were the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

54. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

55. Despite Defendant SSLC's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated Defendant SSLC's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data; and c) that once inside Defendant SSLC's networks and systems, the cybercriminals targeted information including Plaintiffs' and Class Members' Private Information for download and theft.

---

[3] The "Notice Letter". A sample copy is available at https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/08800cf9-9172-4984-a724-ede0328d5a42.html.

56. Companies only send notice letters because data breach notification laws require them to do so. And such letters are only sent to those persons who Defendants and SSLC had a reasonable belief that such personal information was accessed or acquired by an unauthorized individual or entity. SSLC cannot hide behind legalese – by sending a notice of data breach letter to Plaintiffs and Class Members, it admits that SSLC has a reasonable belief that Plaintiffs' and Class Members' names, Social Security numbers, and other sensitive information were accessed or acquired by an unknown actor – aka cybercriminals.

57. Moreover, in its Notice Letter, SSLC failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to SSLC, and whether SSLC set up any mechanism for Class Members to report any misuse of their data.

58. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

59. The attacker targeted, accessed, and acquired files in Defendants' computer systems containing unencrypted Private Information of Plaintiffs and Class Members, including their names, Social Security numbers and PHI. Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach.

***Data Breaches Are Preventable.***

60. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

61. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[5]

62. To prevent and detect cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific

[5] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[6]

63. To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

[6] *Id.* at 3-4.

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[7]

64. Given that Defendants were storing the sensitive Private Information of Plaintiffs and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

65. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of, upon information and belief, millions of individuals, including that of Plaintiffs and Class Members.

---

[7] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited May 19, 2025).

***Defendants Acquire, Collect, and Store Plaintiffs' and Class Members' Private Information.***

66. As a condition of employment or receiving benefits from Defendant SSLC's clients, Plaintiffs and Class Members were required to give their sensitive and confidential Private Information to Defendants.

67. Defendants retain and store this information and derive a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiffs' and Class Members' Private Information, Defendants would be unable to perform their services.

68. By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

69. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendants to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

70. Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members.

***Defendants Knew or Should Have Known of the Risk Because Companies in Possession of Private Information are Particularly Susceptible to Cyber Attacks.***

71. Data thieves regularly target companies like Defendants due to the highly sensitive information that they maintain. Defendants knew and understood that unprotected

Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

72. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information and other sensitive information, like Defendants, preceding the date of the breach.

73. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[8] Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry.[9] The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.[10] The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[11]

74. In light of recent high profile data breaches at other industry leading companies, including National Public Data (2.9 billion records, August 2024), Ticketmaster Entertainment, LLC (560 million records, May 2024), Change Healthcare Inc. (145 million records, February 2024), Dell Technologies, Inc. (49 million records,

---

[8] *See 2023 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2024); https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[9] *Id.*

[10] *Id.*

[11] *Id.*

May 2024), and AT&T Inc. (73 million records, April 2024), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

75. Additionally, as companies became more dependent on computer systems to run their business,[12] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[13]

76. As custodians of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiffs and Class members, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

77. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

78. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system

---

[12] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[13] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

79. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to, upon information and belief, millions of individuals' detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

80. In the Notice Letter, Defendant SSLC makes an offer of 24 months of identity monitoring services. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs and Class Members' Private Information. Moreover, once this service expires, Plaintiffs and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

81. Defendant SSLC's offering of credit and identity monitoring establishes that Plaintiffs' and Class Members' sensitive Private Information *was* in fact affected, accessed, compromised, and exfiltrated from Defendant SSLC's computer systems.

82. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failures to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

83. The ramifications of Defendants' failures to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private

Information is stolen—particularly PHI—fraudulent use of that information and damage to victims may continue for years.

84. As companies in possession of confidential Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiffs and Class Members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

***Value of Personally Identifying Information.***

85. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

86. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark

[14] 17 C.F.R. § 248.201 (2013).
[15] *Id.*

web pricing for stolen identity credentials.[16] For example, Personal Information can be sold at a price ranging from $40 to $200.[17] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18]

87. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[19]

88. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the pharmaceutical industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

---

[16] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited May 19, 2025).

[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited May 19, 2025).

[18] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited May 19, 2025).

[19] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited May 19, 2025).

89. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[20] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[21] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[22]

90. According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[23]

91. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[24]

92. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to

---

[20] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last visited May 19, 2025).

[21] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed May 19, 2025).

[22] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/ (last accessed May 19, 2025).

[23] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed May 19, 2025).

[24] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed May 19, 2025).

pay out-of-pocket costs for healthcare they did not receive to restore coverage.[25] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[26]

93. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—PHI, date of birth, and name.

94. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[27]

95. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

---

[25] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed May 19, 2025).

[26] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/ (last accessed May 19, 2025).

[27] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 19, 2025).

96. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[28]

97. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Defendants Fail to Comply with FTC Guidelines.***

98. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

99. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they

---

[28] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited May 19, 2025).

keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[29]

100. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[30]

101. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

102. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect employee data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential employee data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

103. These FTC enforcement actions include actions against companies like

---

[29] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 19, 2025).
[30] *Id.*

Defendants.

104. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duties in this regard.

105. Defendants failed to properly implement basic data security practices.

106. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to SSLC's clients' employees' and beneficiaries Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

107. Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of Plaintiffs and Class Members, and Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

***Defendants Fail to Comply with Industry Standards.***

108. As noted above, experts studying cyber security routinely identify insurance companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

109. Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

110. Other best cybersecurity practices that are standard for insurance companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

111. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

112. These foregoing frameworks are existing and applicable industry standards

for insurance companies safeguarding their clients' employees' data, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***Common Injuries and Damages.***

113. As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

***The Data Breach Increases Victims' Risk of Identity Theft.***

114. As Plaintiffs have already experienced, the unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

115. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

116. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

117. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

118. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[31]

---

[31] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-

119. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

120. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

121. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

122. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

123. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

---

life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud.***

124. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

125. Thus, due to the actual and imminent risk of identity theft, Defendant SSLC, in its Notice Letter instructs Plaintiffs and Class Members to take the following measures to protect themselves: "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity."[32]

126. In addition, Defendant SSLC's Notice letter recommends Plaintiffs and Class Members to partake in activities such monitoring their accounts, placing fraud alerts on their accounts, and contacting consumer reporting bureaus.[33]

127. Defendant SSLC's extensive suggestion of steps that Plaintiffs and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiffs and Class Members must undertake in response to the Data Breach. Plaintiffs' and Class Members' time is highly valuable and

[32] Notice Letter.
[33] *Id.*

irreplaceable, and accordingly, Plaintiffs and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of Defendants' Notice Letter.

128. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach and signing up for credit monitoring insurance services. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

129. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[34]

130. Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and

[34] *See* United States Government Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

correcting their credit reports.[35]

131. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

***Diminution of Value of Private Information.***

132. Private Information is a valuable property right.[36] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

133. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[37]

134. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[38] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public

---

[35] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited May 19, 2025).

[36] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited May 19, 2025) ("GAO Report").

[37] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[38] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited May 19, 2025).

information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[39,40] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[41]

135. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

136. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

137. The fraudulent activity resulting from the Data Breach may not come to light for years.

138. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and

---

[39] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[40] https://datacoup.com/.
[41] https://digi.me/what-is-digime/.

will continue to incur such damages in addition to any fraudulent use of their Private Information.

139. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' networks, amounting to, upon information and belief, millions of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

140. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

***Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary.***

141. Given the type of targeted attack, the sophisticated criminal activity, the type of Private Information involved in this case, and Plaintiffs' Private Information already being disseminated on the dark web, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

142. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer

of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

143. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

144. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant SSLC's Data Breach.

***Loss of Benefit of the Bargain.***

145. Furthermore, Defendants' poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to employment and the receipt of with Defendant SSLC's clients under certain terms, Plaintiffs and other reasonable employees and/or beneficiaries understood and expected that Defendants would properly safeguard and protect their Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class Members received employment positions and benefits services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant SSLC's clients.

***Plaintiff Beasley's Experience.***

146. Upon information and belief, Defendants obtained Plaintiff Beasley's Private Information in the course of conducting their regular business operations.

147. Plaintiff Beasley is a former customer of one of SSLC's clients.

148. Plaintiff Beasley is very careful about sharing her sensitive Private

Information. Plaintiff Beasley stores any documents containing her Private Information in a safe and secure location. Plaintiff Beasley has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

149. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Beasley's Private Information in their systems.

150. Plaintiff Beasley received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 20, 2025. According to the Notice Letter, Plaintiff Beasley's Private Information was improperly accessed and obtained by unauthorized third parties, including her full name, date of birth, and medical insurance information.

151. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Beasley to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[42] Plaintiff Beasley made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring insurance services. Plaintiff Beasley has spent significant time and resources on mitigation activities in response to the Data Breach--valuable time Plaintiff Beasley otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

[42] Notice Letter.

152. Subsequent to the Data Breach, Plaintiff Beasley has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

153. Plaintiff Beasley further suffered actual injury in the form of her Private Information being disseminated on the dark web, according to Experian, which, upon information and belief, was caused by the Data Breach.

154. In April 2025, a credit monitoring company notified Plaintiff Beasley that a fraudulent transaction had been made using her Private Information, which upon information and belief, is a result of the Data Breach.

155. Plaintiff Beasley additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an

individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

156. The Data Breach has caused Plaintiff Beasley to suffer fear, anxiety, and stress of future identity theft and misuse of her information, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Beasley of key details about the Data Breach's occurrence.

157. Since being notified of the Data Breach, Plaintiff Beasley has spent approximately two hours per week reviewing bank and credit card statements, researching the Data Breach, dealing with an uptick in spam, reviewing credit reports, and dealing with the fraudulent transaction on her account. As a result of the Data Breach, Plaintiff Beasley anticipates spending additional considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

158. As a result of the Data Breach, Plaintiff Beasley is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

159. Plaintiff Beasley has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Ward's Experience.***

160. Upon information and belief, Defendants obtained Plaintiff Ward's

Private Information in the course of conducting their regular business operations.

161. Plaintiff Ward is a former employee of Dollar Tree, Inc., one of Defendant SSLC's clients.

162. Plaintiff Ward is very careful about sharing her sensitive Private Information. Plaintiff Ward stores any documents containing her Private Information in a safe and secure location. Plaintiff Ward has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

163. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Ward's Private Information in their systems.

164. Plaintiff Ward received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Ward's Private Information was improperly accessed and obtained by unauthorized third parties, including her full name, date of birth, and Social Security number.

165. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Ward to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[43] Plaintiff Ward made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach and multiple credit checks. Plaintiff Ward has spent significant time (approximately 25 hours) and resources on mitigation activities in

[43] Notice Letter.

response to the Data Breach—valuable time Plaintiff Ward otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

166. Subsequent to the Data Breach, Plaintiff Ward has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

167. Plaintiff Ward suffered actual injury in the form of attempted fraud, as she was notified of an unauthorized purchase made using her Private Information without her permission. Plaintiff Ward subsequently received a new credit card from her bank due to the fraud.

168. Plaintiff Ward additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. These text messages often contain pieces of her Private Information exposed in the Breach. This misuse of her Private Information

was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

169. The Data Breach has caused Plaintiff Ward to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Ward of key details about the Data Breach's occurrence.

170. As a result of the Data Breach, Plaintiff Ward anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

171. As a result of the Data Breach, Plaintiff Ward is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

172. Plaintiff Ward has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Carrasquillo's Experience***

173. Upon information and belief, Defendants obtained Plaintiff Carrasquillo's Private Information in the course of conducting their regular business operations.

174. Plaintiff Carrasquillo is a former employee of Dollar Tree, Inc., one of

Defendant SSLC's clients.

175. Plaintiff Carrasquillo is very careful about sharing his sensitive Private Information. Plaintiff Carrasquillo stores any documents containing his Private Information in a safe and secure location. Plaintiff Carrasquillo has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

176. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Carrasquillo's Private Information in their systems.

177. Plaintiff Carrasquillo received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Carrasquillo's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, Social Security number, date of birth, and medical insurance information.

178. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Carrasquillo to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[44] Plaintiff Carrasquillo made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach. Plaintiff Carrasquillo has spent significant time and resources on mitigation activities in response to the Data Breach--valuable time

---

[44] Notice Letter.

Plaintiff Carrasquillo otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

179. Subsequent to the Data Breach, Plaintiff Carrasquillo has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

180. Plaintiff Carrasquillo suffered actual injury in the form of fraud. After the Data Breach, Plaintiff Carrasquillo suffered a string of fraudulent transactions to his Bank of America account, which was previously used for his direct deposit at Dollar Tree. The amount of the fraudulent transactions totaled between $200 to $300. Plaintiff Carrasquillo has yet to be reimbursed for these transactions. Upon information and belief, these fraudulent transactions were caused by the Data Breach because they were perpetrated using Private Information exposed in the Data Breach.

181. Plaintiff Carrasquillo additionally suffered actual injury in the form of

experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. The spam messages often try to obtain additional personal information and money from Plaintiff Carrasquillo. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

182. The Data Breach has caused Plaintiff Carrasquillo to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Carrasquillo of key details about the Data Breach's occurrence.

183. As a result of the Data Breach, Plaintiff Carrasquillo anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

184. As a result of the Data Breach, Plaintiff Carrasquillo is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

185. Plaintiff Carrasquillo has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Lawson's Experience.***

186. Upon information and belief, Defendants obtained Plaintiff Lawson's Private Information in the course of conducting their regular business operations.

187. Plaintiff Lawson is a recipient of employee benefit service from Defendant SSLC and enrolled for employee benefits through one of Defendant SSLC's clients.

188. Plaintiff Lawson is very careful about sharing his sensitive Private Information. Plaintiff Lawson stores any documents containing his Private Information in a safe and secure location. Plaintiff Lawson has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

189. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Lawson's Private Information in their systems.

190. Plaintiff Lawson received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 29, 2025. According to the Notice Letter, Plaintiff Lawson's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name and Social Security number.

191. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Lawson to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any

unauthorized activity.[,]"[45] Plaintiff Lawson made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring insurance services. Plaintiff Lawson has spent significant time and resources on mitigation activities in response to the Data Breach—valuable time Plaintiff Lawson otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

192. Subsequent to the Data Breach, Plaintiff Lawson has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

193. Plaintiff Lawson suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was

[45] Notice Letter.

caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud

194. Further, Plaintiff Lawson suffered actual injury in the form of fraud, as multiple unauthorized transactions have been made on Plaintiff Lawson's financial account using his Private Information without his knowledge or consent.

195. In addition to the fraud, Plaintiff Lawson received notice from a credit monitoring service that his confidential information was posted on the dark web.

196. The Data Breach has caused Plaintiff Lawson to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Lawson of key details about the Data Breach's occurrence.

197. As a result of the Data Breach, Plaintiff Lawson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

198. As a result of the Data Breach, Plaintiff Lawson is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

199. Plaintiff Lawson has a continuing interest in ensuring that his Private

Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

1:2025-cv-00393)

200. Upon information and belief, Defendants obtained Plaintiff Tucker's Private Information in the course of conducting their regular business operations.

201. Plaintiff Tucker is a recipient of employee benefit service from Defendant SSLC and enrolled for employee benefits through one of Defendant SSLC's clients.

202. Plaintiff Tucker is very careful about sharing his sensitive Private Information. Plaintiff Tucker stores any documents containing his Private Information in a safe and secure location. Plaintiff Tucker has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

203. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Tucker's Private Information in their systems.

204. Plaintiff Tucker received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Tucker's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, Social Security number, date of birth, and medical insurance information.

205. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Tucker to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any

unauthorized activity.[,]"[46] Plaintiff Tucker made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring insurance services. Plaintiff Tucker has spent significant time and resources on mitigation activities in response to the Data Breach--valuable time Plaintiff Tucker otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

206. Subsequent to the Data Breach, Plaintiff Tucker has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

207. Plaintiff Tucker additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information

[46] Notice Letter.

and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

208. The Data Breach has caused Plaintiff Tucker to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Tucker of key details about the Data Breach's occurrence.

209. As a result of the Data Breach, Plaintiff Tucker anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

210. As a result of the Data Breach, Plaintiff Tucker is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

211. Plaintiff Tucker has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Carter's Experience.***

212. Upon information and belief, Defendants obtained Plaintiff Carter's Private Information in the course of conducting their regular business operations.

213. Plaintiff Carter is a beneficiary of a recipient of employee benefit services from Defendant SSLC.

214. Plaintiff Carter is very careful about sharing his sensitive Private Information. Plaintiff Carter stores any documents containing his Private Information in a safe and secure location. Plaintiff Carter has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

215. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Carter's Private Information in their systems.

216. Plaintiff Carter received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 20, 2025. According to the Notice Letter, Plaintiff Carter's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, date of birth, and medical insurance information.

217. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Carter to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[47] Plaintiff Carter made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring insurance services. Plaintiff Carter has spent significant time and resources on mitigation

---

[47] Notice Letter.

activities in response to the Data Breach--valuable time Plaintiff Carter otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

218. Subsequent to the Data Breach, Plaintiff Carter has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

219. Plaintiff Carter additionally suffered actual injury in the form of experiencing an increase in spam calls, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails,

calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

220. The Data Breach has caused Plaintiff Carter to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Carter of key details about the Data Breach's occurrence.

221. As a result of the Data Breach, Plaintiff Carter anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

222. As a result of the Data Breach, Plaintiff Carter is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

223. Plaintiff Carter has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Johnson's Experience.***

224. Upon information and belief, Defendants obtained Plaintiff Johnson's Private Information in the course of conducting their regular business operations.

225. Plaintiff Johnson is a former employee of Dollar Tree, one of Defendant SSLC's clients.

226. Plaintiff Johnson is very careful about sharing his sensitive Private Information. Plaintiff Johnson stores any documents containing his Private Information in a safe and secure location. Plaintiff Johnson has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured

source.

227. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Johnson's Private Information in their systems.

228. Plaintiff Johnson received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Johnson's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, Social Security number, date of birth, and medical insurance information.

229. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Johnson to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[48] Plaintiff Johnson made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring insurance services. Plaintiff Johnson has spent significant time and resources on mitigation activities in response to the Data Breach--valuable time Plaintiff Johnson otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

230. Subsequent to the Data Breach, Plaintiff Johnson has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his

[48] Notice Letter.

Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

231. Plaintiff Johnson further suffered actual injury in the form of fraud and identity theft. On March 31, 2025, Plaintiff Johnson cancelled his debit card after noticing fraudulent charges on his account in varying amounts. These fraudulent charges drained Plaintiff Johnson's account, causing him to incur overdraft fees in the amount of $60.00. Plaintiff Johnson has spent, and continues to spend time attempting to resolve these issues which, upon information and belief, were caused by the Data Breach.

232. The Data Breach has caused Plaintiff Johnson to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Johnson of key details about the Data Breach's occurrence.

233. As a result of the Data Breach, Plaintiff Johnson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

234. As a result of the Data Breach, Plaintiff Johnson is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

235. Plaintiff Johnson has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Island's Experience.***

236. Upon information and belief, Defendants obtained Plaintiff Island's Private Information in the course of conducting their regular business operations.

237. Plaintiff Island is a former employee of Dollar General , one of Defendant SSLC's clients.

238. Plaintiff Island is very careful about sharing his sensitive Private Information. Plaintiff Island stores any documents containing his Private Information in a safe and secure location. Plaintiff Island has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

239. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Island's Private Information in their systems.

240. Plaintiff Island received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Island's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, Social Security number, and date of birth.

241. As a result of the Data Breach, and at the direction of Defendant SSLC's

Notice Letter, which instructs Plaintiff Island to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[49] Plaintiff Island made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring insurance services, notifying his bank of his involvement in the Data Breach, and monitoring his accounts. Plaintiff Island has spent significant time, at least ten hours, and resources on mitigation activities in response to the Data Breach—valuable time Plaintiff Island otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

242. Subsequent to the Data Breach, Plaintiff Island has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private

---

[49] Notice Letter.

Information.

243. Plaintiff Island additionally suffered actual injury in the form of experiencing an increase in spam calls and texts messages from unknown actors who fraudulently purport that he owes them money, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

244. Additionally, following the Data Breach, Plaintiff Island received a notification from his credit monitoring company that his information was available on the Dark Web, which, upon information and belief, was caused by the Data Breach. The Data Breach has caused Plaintiff Island to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants has still not fully informed Plaintiff Island of key details about the Data Breach's occurrence.

245. As a result of the Data Breach, Plaintiff Island anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

246. As a result of the Data Breach, Plaintiff Island is at a present risk and will

continue to be at increased risk of identity theft and fraud for years to come.

247. Plaintiff Island has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Madeline Whelan's Experience.***

248. Upon information and belief, Defendants obtained Plaintiff Whelan's Private Information in the course of conducting their regular business operations.

249. Plaintiff Whelan is a former employee of Dollar Tree, one of Defendant SSLC's clients.

250. Plaintiff Whelan is very careful about sharing her sensitive Private Information. Plaintiff Whelan stores any documents containing her Private Information in a safe and secure location. Plaintiff Whelan has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

251. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Whelan's Private Information in their systems.

252. Plaintiff Whelan received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Whelan's Private Information was improperly accessed and obtained by unauthorized third parties, including her full name, Social Security number, and date of birth.

253. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Whelan to "be vigilant for incidents of fraud or

identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[50] Plaintiff Whelan made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, contacting counsel, and continuously monitoring her accounts for fraud and misuse. Plaintiff Whelan has spent significant time (at least 2 hours per month since she was made aware of the Data breach) and resources on mitigation activities in response to the Data Breach--valuable time Plaintiff Whelan otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

254. Subsequent to the Data Breach, Plaintiff Whelan has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

[50] Notice Letter.

255. Plaintiff Whelan further suffered actual injury in the form of experiencing an increase in spam calls and texts messages from unknown actors who purport to be hiring, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

256. The Data Breach has caused Plaintiff Whelan to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Whelan of key details about the Data Breach's occurrence.

257. As a result of the Data Breach, Plaintiff Whelan anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

258. As a result of the Data Breach, Plaintiff Whelan is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

259. Plaintiff Whelan has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Whiting's Experience.***

260. Upon information and belief, Defendants obtained Plaintiff Whiting's Private Information in the course of conducting their regular business operations.

261. Plaintiff Whiting is a former employee of Family Dollar, one of Defendant SSLC's clients.

262. Plaintiff Whiting is very careful about sharing his sensitive Private Information. Plaintiff Whiting stores any documents containing her Private Information in a safe and secure location. Plaintiff Whiting has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

263. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Whiting's Private Information in their systems.

264. Plaintiff Whiting received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Whiting's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, Social Security number, and date of birth.

265. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Whiting to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[51] Plaintiff Whiting made reasonable efforts to mitigate the

[51] Notice Letter.

impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, contacting counsel, and continuously monitoring his accounts for fraud and misuse. Plaintiff Whiting has spent significant time (at least 2 hours per month since he was made aware of the Data breach) and resources on mitigation activities in response to the Data Breach--valuable time Plaintiff Whiting otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

266. Subsequent to the Data Breach, Plaintiff Whiting has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

267. Plaintiff Whiting further suffered actual injury in the form of experiencing an increase in spam calls and texts messages from unknown actors who purport to be hiring, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that

cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

268. The Data Breach has caused Plaintiff Whiting to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Whiting of key details about the Data Breach's occurrence.

269. As a result of the Data Breach, Plaintiff Whiting anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

270. Indeed, Plaintiff Whiting has received a notification from LifeLock that his information is available on the dark web.

271. As a result of the Data Breach, Plaintiff Whiting is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

272. Plaintiff Whiting has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Nolley's Experience.***

273. Upon information and belief, Defendants obtained Plaintiff Nolley's

Private Information in the course of conducting their regular business operations.

274. Plaintiff Nolley is a former employee of Dollar Tree, Inc, one of Defendant SSLC's clients.

275. Plaintiff Nolley is very careful about sharing her sensitive Private Information. Plaintiff Nolley stores any documents containing her Private Information in a safe and secure location. Plaintiff Nolley has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

276. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Nolley's Private Information in their systems.

277. Plaintiff Nolley received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Nolley's Private Information was improperly accessed and obtained by unauthorized third parties, including her full name, Social Security number, date of birth, and medical insurance information.

278. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Nolley to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[52] Plaintiff Nolley made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the

[52] Notice Letter.

legitimacy of the Data Breach as well as signing up for credit monitoring insurance services. Plaintiff Nolley has spent significant time and resources on mitigation activities in response to the Data Breach—valuable time Plaintiff Nolley otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

279. Subsequent to the Data Breach, Plaintiff Nolley has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

280. The Data Breach has caused Plaintiff Nolley to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Nolley of key details about the Data Breach's occurrence.

281. As a result of the Data Breach, Plaintiff Nolley anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

282. As a result of the Data Breach, Plaintiff Nolley is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

283. Plaintiff Nolley has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Nguyen's Experience.***

284. Upon information and belief, Defendants obtained Plaintiff Nguyen's Private Information in the course of conducting their regular business operations.

285. Plaintiff Nguyen is a former employee of Dollar Tree, Inc., one of Defendant SSLC's clients.

286. Plaintiff Nguyen is very careful about sharing his sensitive Private Information. Plaintiff Nguyen stores any documents containing his Private Information in a safe and secure location. Plaintiff Nguyen has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

287. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Nguyen's Private Information in their systems.

288. Plaintiff Nguyen received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Nguyen's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, Social Security number, date of birth, and medical insurance information.

289. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Nguyen to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[53] Plaintiff Nguyen made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring insurance services. Plaintiff Nguyen has spent significant time and resources on mitigation activities in response to the Data Breach--valuable time Plaintiff Nguyen otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

290. Subsequent to the Data Breach, Plaintiff Nguyen has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private

[53] Notice Letter.

Information.

291. Plaintiff Nguyen additionally suffered actual injury in the form of experiencing an increase in spam calls, which, upon information and belief, was caused by the Data Breach. This misuse of his Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

292. Additionally, Plaintiff Nguyen received notice from a credit monitoring service that his confidential information was posted on the dark web.

293. The Data Breach has caused Plaintiff Nguyen to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Nguyen of key details about the Data Breach's occurrence.

294. As a result of the Data Breach, Plaintiff Nguyen anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

295. As a result of the Data Breach, Plaintiff Nguyen is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

296. Plaintiff Nguyen has a continuing interest in ensuring that his Private

Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Bravo's Experience.***

297. Upon information and belief, Defendants obtained Plaintiff Bravo's Private Information in the course of conducting their regular business operations.

298. Plaintiff Bravo is very careful about sharing her sensitive information Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

299. At the time of the Data Breach – on or about November 20, 2024 – Defendants retained Plaintiff's Private Information in its system.

300. Plaintiff Bravo received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 20, 2025. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties, including her full name, date of birth, and medical insurance information.

301. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff to "be vigilant for incidents of fraud or identity by reviewing your account statements and free credit reports for any unauthorized activity.[,]" Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring insurance services. Plaintiff has spent significant time on mitigation activities in response to the Data Breach – valuable time

Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

302. Subsequent to the Data Breach, Plaintiff Bravo has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

303. Plaintiff further suffered actual injury in the form of her Private Information being disseminated on the dark web, according to Experian, which, upon information and belief, was caused by the Data Breach.

304. Plaintiff additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available

sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

305. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff of key details about the Data Breach's occurrence.

306. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

307. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

308. Plaintiff Bravo has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Pettis's Experience.***

309. Upon information and belief, Defendants obtained Plaintiff Pettis's Private Information in the course of conducting their regular business operations.

310. Plaintiff Pettis is a former employee of Dollar Tree, Inc., one of Defendant SSLC's clients.

311. Plaintiff Pettis is very careful about sharing his sensitive Private Information. Plaintiff Pettis stores any documents containing his Private Information in a safe and secure location. Plaintiff Pettis has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

312. At the time of the Data Breach—on or about November 20, 2024—Defendants retained Plaintiff Pettis's Private Information in their systems.

313. Plaintiff Pettis received the Notice Letter, by U.S. mail, directly from Defendant SSLC, dated March 28, 2025. According to the Notice Letter, Plaintiff Pettis's Private Information was improperly accessed and obtained by unauthorized third parties, including his full name, Social Security number, date of birth, and medical insurance information.

314. Plaintiff Pettis has already experienced identity theft as a result of the Data Breach. In March 2025, he was notified that someone had filed a fraudulent tax return using his information. In response, Plaintiff Pettis contacted the IRS, which confirmed that he had been the victim of tax fraud. To file his tax return, Plaintiff Pettis was required to submit an identity theft affidavit to the IRS. Plaintiff Pettis attributes the fraudulent tax return to the Data Breach given that he is very careful with his PII, the Breach included information that could be used to file a fraudulent tax return, the fraudulent tax return was filed shortly after the Data Breach, and nothing like this has ever happened to Plaintiff Pettis prior to now.

315. As a result of the Data Breach, and at the direction of Defendant SSLC's Notice Letter, which instructs Plaintiff Pettis to "be vigilant for incidents of fraud or

identity theft by reviewing your account statements and free credit reports for any unauthorized activity.[,]"[54] Plaintiff Pettis made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach, signing up for credit monitoring insurance services, addressing the fraudulent tax return filed using his information, and carefully reviewing account statements and other personal information. Plaintiff Pettis has spent significant time and resources on mitigation activities in response to the Data Breach—valuable time Plaintiff Pettis otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

316. Subsequent to the Data Breach, Plaintiff Pettis has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private

---

[54] Notice Letter.

Information.

317. Additionally, Plaintiff Pettis experienced actual injury as he is a victim of identity theft. When Plaintiff Pettis attempted to file his taxes this year, he was informed by the IRS that someone else already filed taxes using his Social Security number. As a result of the fraud that occurred, Plaintiff Pettis spent numerous hours communicating with IRS representatives in efforts to resolve the issue, and ultimately received an identity theft affidavit to file along with his taxes.

318. The Data Breach has caused Plaintiff Pettis to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed Plaintiff Pettis of key details about the Data Breach's occurrence.

319. As a result of the Data Breach, Plaintiff Pettis has already spent considerable time and money, and anticipates having to spend more time and money to try to mitigate and address the harms caused by the Data Breach.

320. As a result of the Data Breach, Plaintiff Pettis is at a present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

321. Plaintiff Pettis has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

**CLASS ACTION ALLEGATIONS**

322. Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

323. The Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendants in March 2025, including all those individuals who received notice of the Data Breach (the "Class").

324. Plaintiffs also propose the following "California Subclass," to be represented by Plaintiff Alicia Bravo:

> All individuals residing in California whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendants in March 2025, including all those individuals who received notice of the data breach.

325. Together, the Nationwide Class and the California Subclass are referred to as the "Class."

326. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

327. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

328. <u>Numerosity</u>. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of

Defendants, upon information and belief, 1,025,956 individuals were impacted. The Class is apparently identifiable within Defendants' records, and Defendants have already identified these individuals (as evidenced by sending them breach notification letters).

329. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendants had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendants had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security

procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiffs and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants' wrongful conduct; and,

k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

330. Typicality. Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

331. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

332. Adequacy. Plaintiffs will fairly and adequately represent and protect the

interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

333. Superiority and Manageability. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

334. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class

Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

335. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

336. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

337. Unless a Class-wide injunction is issued, Defendants may continue in their failures to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

338. Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

339. Likewise, particular issues under Rule 23(c)(2) are appropriate for certification because such claims present only particular, common issues, the resolution of

which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the Plaintiffs and the class of the Data Breach;

b. Whether Defendants owed legal duties to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard Plaintiffs' and Class members' Private Information; and,

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### <u>COUNT I</u>
### NEGLIGENCE
### (On Behalf of Plaintiffs and All Class Members)

340. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

341. Defendants require employees and beneficiaries, including Plaintiffs and Class Members, to submit non-public Private Information in the ordinary course of

providing their services.

342. Defendants gathered and stored the Private Information of Plaintiffs and Class Members as part of their business of soliciting their clients and employees, which solicitations and services affect commerce.

343. Plaintiffs and Class Members entrusted Defendants with their Private Information with the understanding that Defendants would safeguard their information.

344. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

345. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

346. Defendants each had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

347. Defendants each owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel and/or partners responsible for them, adequately protected the Private Information.

348. Defendants' duties of care to use reasonable security measures arose as a

result of the special relationship that existed between Defendants and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential Private Information, a necessary part of obtaining employment with Defendant SSLC's clients and receiving benefits from Defendant SSLC.

349. Defendants' duties to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

350. Defendants were each subject to an "independent duty," untethered to any contract between Defendants and Plaintiffs or the Class.

351. Defendants also each had a duty to exercise appropriate clearinghouse practices to remove SSLC's clients' former employees' and beneficiaries Private Information it was no longer required to retain pursuant to regulations.

352. Moreover, Defendants each had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

353. Defendants had and continue to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

354. Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to

protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Allowing unauthorized access to Class Members' Private Information;

d. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

e. Failing to remove the Private Information of former employees and beneficiaries after they were no longer required to retain pursuant to regulations, and;

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

355. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

356. Defendants' violation of Section 5 of the FTC Act constitutes negligence.

357. Plaintiffs and Class Members were within the class of persons the Federal

Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

358. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

359. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

360.

It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting insurance companies in possession of Private Information.

361. Defendants have full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

362. Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants' systems.

363. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

364. Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession.

365. Defendants were in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

366. Defendants' respective duties extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

367. Defendants have admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

368. But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

369. There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the

harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

370. As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) attempted and actual fraud; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

371. As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

372. Additionally, as a direct and proximate result of Defendants' negligence,

Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

373. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

374. Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiffs and Class Members in an unsafe and insecure manner.

375. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and All Class Members)**

376. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

377. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

378. Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Private Information and not complying with

industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

379. Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se.*

380. Plaintiffs and Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

381. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

382. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered or will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) attempted and actual fraud; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in

Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

383. Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and All Class Members)**

384. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

385. Plaintiffs and Class Members conferred a monetary benefit on Defendants. Specifically, they provided their Private Information to Defendants. In exchange, Plaintiffs and Class Members should have had their Private Information protected with adequate data security.

386. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and have accepted and retained that benefit by accepting and retaining the Private Information entrusted to them. Defendants profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

387. Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

388. Defendants acquired the Private Information through inequitable record retention as they failed to investigate and/or disclose the inadequate data security practices

previously alleged.

389. If Plaintiffs and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would have entrusted their Private Information to Defendants or obtained employment/benefits with Defendants' clients.

390. Plaintiffs and Class Members have no adequate remedy at law.

391. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of their Private Information.

392. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

393. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) attempted and actual fraud; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

394. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

395. Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT IV
## Breach of Implied Contract
## (On Behalf of Plaintiffs and All Class Members)

396. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

397. Plaintiffs and Class members were required to provide their Private Information to Defendants as a condition of employment or receiving benefits from

Defendant SSLC's clients. Plaintiffs and Class members (or their third-party agent) provided their Private Information to Defendants in exchange for Defendants' services.

398. Plaintiffs and Class Members reasonably understood that a portion of the funds they paid Defendants would be used to pay for adequate cybersecurity measures.

399. Plaintiffs and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

400. Plaintiffs and the Class Members (or their third-party agent) accepted Defendants' offers by disclosing their Private Information to Defendants in exchange for services.

401. In turn, and through internal policies, Defendants agreed to protect and not disclose the Private Information to unauthorized persons.

402. Implicit in the parties' agreement was that Defendants would provide Plaintiffs and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

403. After all, Plaintiffs and Class Members (or their third-party agent) would not have entrusted their Private Information to Defendants in the absence of such an agreement with Defendants.

404. Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendants.

405. The covenant of good faith and fair dealing is an element of every contract.

Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

406. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

407. Defendants materially breached the contracts they entered with Plaintiffs and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into their computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendants created, received, maintained, and transmitted.

408. In these and other ways, Defendants violated their duty of good faith and fair dealing.

409. Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

410. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

411. Plaintiffs and Class Members performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**COUNT V**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and All Class Members)**

412. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

413. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

414. Defendants each owed a duty to their current and former clients and their employees, including Plaintiffs and the Class, to keep this information confidential.

415. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' Private Information is highly offensive to a reasonable person.

416. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendants, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

417. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

418. Defendant SSLC acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

419. Defendant SSLC acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

420. Acting with knowledge, Defendant SSLC had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

421. The definition of intent is met here under Section 8A of the Restatement (Second) of Torts because, given the ubiquity of data breaches, Defendants were substantially certain that their decision to forego reasonable cybersecurity measures was substantially certain to result in a data breach.

422. As a proximate result of Defendants' acts and omissions, the private and sensitive Private Information of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

423. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

424. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the

Class since their Private Information are still maintained by Defendants with their inadequate cybersecurity system and policies.

425. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the Private Information of Plaintiffs and the Class.

426. In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**COUNT VI**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and All Class Members)**

427. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

428. Given the relationship between Defendants and Plaintiffs and Class Members, where Defendants became guardian of Plaintiffs' and Class Members' Private Information, Defendants became fiduciaries by their undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain

complete and accurate records of what information (and where) Defendants did and do store.

429. Defendants each have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their Private Information.

430. Because of the highly sensitive nature of the Private Information, Plaintiffs and Class Members would not have entrusted Defendants, or anyone in Defendants' positions, to retain their Private Information had they known the reality of Defendants' inadequate data security practices.

431. Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII.

432. Defendants also breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

433. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**COUNT VII**
**Violations of Missouri Merchandising Practices Act,**
**Mo. Rev. Stat. § 407.010 *et seq*.**
**(On Behalf of Plaintiffs and All Class Members)**

434. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

435. RSMo. 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce"…

436. An "unfair practice" is defined by Missouri law, 15 CSR 60-8.020, as any practice which:

(A) Either-

1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

437. An "unfair practice is defined by Missouri law,

15 CSR 60-8.020 (1)(B) provides that an "Unfair Practice in General" is

(1) An unfair practice is any practice which –

(A) Either –

1. <u>Offends any public policy</u> as it has been established by the Constitution, <u>statutes</u> or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or
2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

438. 15CSR 60-8.040 provides that an "Unfair Practice is:

An unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in any manner fail to act in good faith.

439. Plaintiffs and Defendants are "persons" within the meaning of section 407.010 (5).

440. Merchandise is defined by the MMPA, to include the providing of "services" and, therefore, encompasses Healthcare services. Healthcare services are a good.

441. Efforts to maintain the privacy and confidentiality of medical records are part of the healthcare services associated with a good.

442. Maintenance of medical records are "merchandise" within the meaning of section 407.010(4).

443. Plaintiffs' and the Class' goods and services purchased from Defendants were for "personal, family or household purposes" within the meaning of the Missouri Merchandising Practices Missouri Revised Statutes.

444. As set forth herein, Defendants' acts, practices and conduct violate section 407.010(1) in that, among other things, Defendants have used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of services associated with healthcare services. Such acts offend the public policy established by Missouri statute and constitute an "unfair practice" as that term is used in Missouri Revised Statute 407.020(1).

445. Defendants' unfair, unlawful and deceptive acts, practices and conduct include: (1) representing to its patients that it will not disclose their sensitive personal health information to an unauthorized third party or parties; (2) failing to implement security measures such as securing the records in a safe place; and (3) failing to train personnel.

446. Defendants' conduct also violates the enabling regulations for the MMPA because it: (1) offends public policy; (2) is unethical, oppressive and unscrupulous; (3) causes substantial injury to consumers; (4) it is not in good faith; (5) is unconscionable; and (6) is unlawful. *See* Mo Code Regs. Ann tit. 15, Section 60-8.

447. As a direct and proximate cause of Defendants' unfair and deceptive acts, Plaintiffs and members of the Class have suffered damages in that they (1) paid more for medical record privacy protections than they otherwise would have, and (2) paid for medical record privacy protections that they did not receive. In this respect, Plaintiffs and members of the Class have not received the benefit of the bargain and have suffered an ascertainable loss.

448. Plaintiffs, on behalf of themselves and the Class, seek actual damages for all monies paid to Nationstar in violation of the MMPA. In addition, Plaintiffs seek attorneys' fees.

## COUNT VIII
## Declaratory Judgment
## (On Behalf of Plaintiffs and All Class Members)

449. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

450. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

451. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs alleges that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

452. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant SSLC has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, their duties by failing to use reasonable measures to the data entrusted to them; and

d. Defendants breaches of their duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

453. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to it.

454. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant SSLC experiences a second data breach.

455. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

456. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

457. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**COUNT IX**
**Violations of the California Consumer Privacy Act**
**Cal. Civ. Code § 1798.00, et seq. ("CCPA")**
**(On behalf of Plaintiff Bravo and the California Subclass)**

458. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 339, as if fully set forth herein.

459. The CCPA was enacted to protect consumers' sensitive information from collection and use by businesses without appropriate notice and consent.

460. Defendant SSLC is a corporation organized or operated for the profit or financial benefit of its owners. Defendant collects consumers' Private Information (for the purposes of this section, "Private Information") as defined in the CCPA, Cal. Civ. Code § 1798.140.

461. Defendant SSLC violated § 1798.150 of the CCPA by failing to prevent Plaintiffs' and California Subclass Members' nonencrypted Private Information from unauthorized access and exfiltration, theft, or disclosure as a result of SSLC's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

462. Defendant SSLC has a duty to implement and maintain reasonable security procedures and practices to protect Plaintiff Bravo's and California Subclass Members' Private Information. As detailed herein, SSLC failed to do so.

463. As a direct and proximate result of Defendant SSLC's acts, Plaintiff Bravo's and California Subclass Members' Private Information, including names, contact information, dates of birth, health insurance information, and other sensitive medical records, was subjected to unauthorized access and exfiltration, theft, or disclosure.

464. Plaintiff Bravo and California Subclass Members seek injunctive or other equitable relief to ensure Defendant SSLC hereinafter properly safeguards customer Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold customer Private Information, including Plaintiffs' and California Subclass Members' Private Information.

Plaintiffs and California Subclass Members have an interest in ensuring that their Private Information is reasonably protected.

465. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant SSLC and third parties with similar inadequate security measures.

466. Plaintiff Bravo and California Subclass Members seek actual damages, as well as all monetary and non-monetary relief allowed by law, including actual financial losses; injunctive relief; and reasonable attorneys' fees and costs.

467. On April 15, 2025, counsel for Plaintiff Bravo provided written notice via certified mail to Defendant SSLC at its principal place of business of the intent to pursue claims under the CCPA and an opportunity for Defendant SSLC to cure. The domestic return receipt shows that SSLC received the letter. Plaintiffs' written notice set forth the violations of SSLC's duty to implement and maintain reasonable security procedures and practices alleged in this Consolidated Class Action Complaint.

468. To date, Defendant SSLC has taken no action to remedy its misconduct or otherwise address the violations outlined in the written notice sent by Plaintiff Bravo's counsel.

469. Plaintiff Bravo and the California Subclass seek actual damages, as well as all monetary and non-monetary relief allowed by law, including statutory damages of up to $750 per customer per incident, actual financial losses; injunctive relief; and reasonable attorneys' fees and costs. *See* Cal. Civil Code § 1798.150.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendants and that the Court grants the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the

retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v. prohibiting Defendants from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

Vi. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x. requiring Defendants to conduct regular database scanning and securing checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii. requiring Defendants to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendants to implement a system of tests to assess their employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to

provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees and costs as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury on all claims so triable.

Dated: May 28, 2025 Respectfully submitted,

Maureen M. Brady MO #57800
**MCSHANE & BRADY, LLC**
4006 Central Street
Kansas City, MO 64111
Phone: (816) 888-8010
Fax: (816) 332-6295
Email: mbrady@mcshanebradylaw.com

John F. Garvey, Jr., #35879 (MO)
Colleen Garvey, #72809(MO)
**STRANCH, JENNINGS & GARVEY, PLLC**
701 Market Street, Suite 1510
Tel: (314) 390-6750
jgarvey@stranchlaw.com
cgarvey@stranchlaw.com

J. Gerard Stranch, IV (TN BPR #23045)*
Grayson Wells #73068 (MO)
**STRANCH, JENNINGS, & GARVEY, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Tel: 615/254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Andrew J. Shamis
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: 305-379-2299
Email: ashamis@shamisgentile.com

Casondra Turner (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (866) 252-0878
cturner@milberg.com

Raina Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
E: raina@straussborrelli.com

A. Brooke Murphy
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
T: (405) 389-4989
E: abm@murphylegalfirm.com

William B. Federman*
Kennedy M. Brian*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Ph: (405) 235-1560
F: (405) 239-2112
Email: wbf@federmanlaw.com
* *Admitted Pro Hac Vice*

Jonathan S. Mann (ASB-1083-A36M) **
**PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
jonm@pittmandutton.com

***Pro Hac Vice* application forthcoming

*Attorneys for Plaintiffs and the Putative Class*